1  Imran F. Vakil, Esq. (Bar No. 248859)
      ivakil@nexiolaw.com
2  Randal Robinson (Bar No. 327417)
      rrobinson@nexiolaw.com
3  **NEXIO, PC**
4  18012 Cowan, Suite 200
   Irvine, California 92614
5  Phone:      (949) 478-6830
   Facsimile:  (949) 478-1275
6
7  *Attorneys for Defendant/Counterclaimant,*
   *No Bad Days Enterprises, Inc.*
   *and Defendant Scott Sample*
8

9

10                **UNITED STATES DISTRICT COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

12

13  COVE USA, LLC,                          Case No. 8:20-cv-02314-JLS-KES

14          Plaintiff,                      **COUNTERCLAIMANT NO BAD**
                                            **DAYS ENTERPRISES, INC.'S**
15  v.                                      **NOTICE OF MOTION AND MOTION**
                                            **FOR PRELIMINARY INJUNCTION;**
16  NO BAD DAYS ENTERPRISES, INC.;          **MEMORANDUM OF POINTS AND**
    SCOTT SAMPLE; and DOES 1-10,            **AUTHORITIES**
17
18          Defendants.                     [*Declaration of Scott Sample filed*
                                            *concurrently herewith*]
19  ─────────────────────────────
    NO BAD DAYS ENTERPRISES, INC.
20                                          Date:       Friday, October 8, 2021
            Counterclaimant,                Time:       10:30a.m.
21                                          Courtroom:  10A
                                            Judge:      Hon. Josephine L. Staton
22  v.

23
    COVE USA, LLC; SEAN ARCHER
24  TODD; and ROES 1-10 INCLUSIVE,

25          Counterdefendants.
26

27

28
   ──────────────────────────────────────────────
            **COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1   TO ALL PARTIES HERETO AND THEIR ATTORNEYS OF RECORD:

2           PLEASE TAKE NOTICE that on October 8, 2021, at 10:30 a.m., or as soon

3   thereafter as the matter may be heard in the courtroom of the Honorable Josephine L.

4   Staton, Judge of the United States District Court, located at the Ronald Reagan Federal

5   Building and United States Courthouse, 411 W. Fourth St., Santa Ana, CA, 92701,

6   Courtroom 10A, 10th Floor, Counterclaimant No Bad Days Enterprises, Inc. ("NBD"), by

7   and through its attorneys of record, will and hereby does move for an order for a

8   preliminary injunction (a) restraining and enjoining Counterdefendants Cove USA, LLC

9   ("Cove USA"), Sean Archer Todd ("Todd") (collectively, Cove USA and Todd are referred

10  to herein as "Cove"), their partners, officers, directors, employees, agents, and

11  representatives, and all persons, firms and corporations in active concert or participation

12  with them from using in any manner NBD's NO BAD DAYS trademark, or any mark or

13  trade name that is confusingly similar to or a colorable imitation of the NO BAD DAYS

14  trademark; (b) doing any act or thing calculated or likely to cause confusion or mistake in

15  the minds of the members of the public or prospective customers as to the source of the

16  products offered or distributed by Cove, or likely to confuse members of the public or

17  prospective customers into believing that there is some connection between NBD and Cove

18  or any other entity owned by or associated with Cove; (c) otherwise competing unfairly

19  with NBD in any manner; or (d) assisting, aiding, or abetting any other person or business

20  entity in engaging in or performing any of the activities referred to in parts (a) through (c)

21  of this paragraph.

22          The grounds for this motion are that Cove is using NBD's NO BAD DAYS

23  trademark on competing articles of clothing and other products, without NBD's permission.

24  Cove's conduct is likely to cause confusion in the marketplace, and its use of the NO BAD

25  DAYS trademark on competing goods is an infringement of NBD's trademark rights.

26  Cove's actions, as described above, have caused and will continue to cause irreparable

27

28

ii

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1    injury to NBD unless the activities described above are enjoined pending trial of this
2    action.

3          This Motion is based on this Notice of Motion and Motion and the attached
4    Memorandum of Points and Authorities, the Declaration of Scott Sample and exhibits
5    thereto, the pleadings and records on file in this action, and upon such other and further
6    evidence and argument as may be presented to the Court.

7          As this Motion is an application for a preliminary injunction, it is exempt from L.R.
8    7-3 by its terms.

9          PLEASE TAKE FURTHER NOTICE that currently, and until further notice, Judge
10   Staton's civil matters will proceed on Zoom. Counsel are required to check the docket by
11   4:00pm the day prior to the hearing for more information. Zoom information for all public
12   hearings will also be posted on the Court's daily calendar.

13

14

15   Dated: April 27, 2021         **NEXIO, PC**

16

17                      By:   /s/ Imran F. Vakil /

18                         Imran F. Vakil
19                         *Attorneys for Counterclaimant,*
                           *No Bad Days Enterprises, Inc.*

20

21

22

23

24

25

26

27

28

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND................................................................. 2

    A.    NBD And Its Successful NO BAD DAYS Mark ........................... 2

    B.    Cove's Infringing Clothing And Other Goods Also Sold Online ............ 4

III.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION............................ 6

IV.  COVE'S SALES OF INFRINGING NO BAD DAYS GOODS SHOULD BE
     ENJOINED PENDING TRIAL ............................................................. 7

    A.    NBD Is Likely To Succeed On The Merits Of Its Trademark Claims..... 7

        i.    *The NO BAD DAYS Mark is Valid and Protectable* ........................... 7

        ii.   *Cove's Goods are Likely to Cause Confusion*...................................... 8

    B.    NBD Is Entitled To A Presumption Of Irreparable Harm .................... 13

    C.    The Balance Of Equities Favors NBD .................................................... 14

    D.    An Injunction Is In The Public Interest .................................................. 15

V.   A BOND IS UNWARRANTED IN THIS CASE ................................. 15

VI.  CONCLUSION ................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446
   (9th Cir. 1991)...................................................................................... 12

*Accuride Intern, Inc. v. Accuride Corp.*, 871 F.2d 1531 (9th Cir. 1989) .............................. 9

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829 (9th Cir. 1991) .................................... 9

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)...............................8, 10, 12, 13

*Boldface Licensing + Branding v. By Lee Tillett*, Inc., 940 F. Supp. 2d 1178 (C.D. Cal.
   2013) ......................................................................................................7

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)7, 8, 11

iv

*BYD Co. v. Khazai*, 2020 U.S. Dist. LEXIS 121889 (C.D. Cal. July 10, 2020) .................. 15

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) .................... 11

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ................................. 8, 9

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1165 (C.D. Cal. 2010) .......................................................................................................................... 12

*First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987) ............................... 8

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) .................................... 8

*Grooms v. Legge*, 2009 U.S. Dist. LEXIS 21456 (S.D. Cal. Mar. 17, 2009) ...................... 11

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) .............. 13

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819 (9th Cir. 1993) ........................... 13

*Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ................................................. 15

*Kendall-Jackson Winery*, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042 (9th Cir. 1998) ....... 9

*K-Swiss Inc. v. USA AISIQI Shoes Inc.*, 291 F. Supp. 2d 1116 (C.D. Cal. 2003) ................ 12

*Maxim Integrated Prods. v. Quintana,* 654 F.Supp.2d 1024 (N.D.Cal. 2009) .................... 10

*Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271 (C.D. Cal. 2008).......... 15

*Mytee Prods. v. Harris Research, Inc.*, 2010 U.S. Dist. LEXIS 148461 (S.D. Cal. June 25, 2010) .......................................................................................................................... 15

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3rd Cir. 1990) ............ 15

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189 (1985) ....................................... 8

*Playboy Enters. v. Chuckleberry Publ'g, Inc.*, 486 F.Supp. 414 (S.D.N.Y. 1980) ............... 9

*Seed Servs., Inc. v. Winsor Grain, Inc.,* 868 F. Supp. 2d 998 (E.D. Cal. 2012) .................. 15

*Surf Line Hawaii, Ltd. v. Ahakuelo*, 1989 U.S. Dist. LEXIS 11869 (D. Haw. Sep. 22, 1989) .......................................................................................................................... 11, 12

*Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303 (D.Mass. 1995) .......... 11

*Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.,* 609 F.3d 975 (9th Cir. 2010) . 6

*Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108 (9th Cir. 2010)....................... 7

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1

**Statutes, Rules, and Authorities**

2

15 U.S.C. § 1114 ........................................................................................7

3

15 U.S.C. § 1115(b) ..................................................................................7

4

15 U.S.C. § 1116 ......................................................................................13

5

15 U.S.C. § 1116(a) .............................................................................6, 13

6

Pub. L. 116-260, § 226, 134 Stat. 2208 (2020) ......................................13

7

Trademark Modernization Act..................................................................13

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

This case stems from Counterdefendants' blatant disregard for the intellectual property rights of others in search of a quick buck. Counterclaimant No Bad Days Enterprises, Inc. ("NBD") has spent decades building up its brand "No Bad Days" from a one-person business in Southern California that hand delivered its goods to a successful family-run enterprise that has sold millions of shirts, sweatshirts, hats, other clothing items, decals, keychains, and other gift products, and distributes its clothing and other items throughout the country via major retailers. Aware of the important value of its trademark, NBD obtained multiple trademark registrations from the USPTO for the mark "NO BAD DAYS," one of which has since become incontestable.[1]

Seeking to trade on NBD's success, at some point in late 2020 Counterdefendants Cove USA, LLC and its owner/operator Sean Archer Todd (collectively, "Cove") began using NBD's recognized mark on their own T-shirts, sweatshirts, and decals and began selling these competing goods via online e-commerce stores such as Shopify and Cove's own website, which has already created at least one instance of actual confusion and threatens to undo NBD's decades of hard work in building the NO BAD DAYS brand.

A preliminary injunction precluding Cove from selling goods with the NO BAD DAYS Mark pending trial is warranted. NBD unquestionably has a valid, protectable trademark, as evidenced by its incontestable registration. Furthermore, Cove's use of the identical mark on its own clothing (and decals) creates a likelihood of consumer confusion, as shown by the fact that all eight of the Ninth Circuit's *Sleekcraft* factors either favor NBD or are not applicable. Finally, pursuant to recently amended 15 U.S.C. § 1116, NBD is entitled to a presumption of irreparable harm – a presumption which in this case is only bolstered by evidence that the lesser quality of Cove's knockoff clothing is endangering NBD's hard-won reputation.

---

[1] Reg. Nos. 2,219,259 (1999), 3,453,878 (2008), and 3,396,364 (2008) should have been incontestable. However, a calendaring error resulted in the abandonment, necessitating refiling.

1   II.   **FACTUAL BACKGROUND**

2       A.   **NBD And Its Successful NO BAD DAYS Mark**

3           Inspired by his time in a small fishing village in the Baja Peninsula during the

4   1980's, Tom Sample, an avid saltwater sport fisherman from Huntington Beach, California,

5   envisioned a brand that encapsulated the village's laid-back lifestyle. Declaration of Scott

6   Sample ("Sample Decl.") ¶ 2. In or about 1996, Tom began selling decals, shirts, hats and

7   keychains emblazoned with his signature mark "No Bad Days" (the "NO BAD DAYS

8   Mark" or "Mark"). *Id.* Tom originally sold his products in small mom and pop gift shops

9   and surf shops in the San Diego and Orange County areas of California, where the

10  trademark phrase garnered a following in the surf and saltwater fishing communities. *Id.*

11          In early 2000, Tom lost his battle with cancer, leaving the No Bad Days legacy to his

12  son, Scott. Sample Decl. ¶ 3. Scott picked up where his father left off, selling apparel and

13  decals under his father's brand "No Bad Days." *Id.* Scott, a classic car buff himself, also

14  expanded the brand's reach into that community, using his black 1930 DeSoto 3-window

15  Business Coupe to personally deliver products. *Id.*

16          Scott began selling eco-friendly products bearing the Mark online via website in or

17  about 2001. *Id.* ¶ 4. Scott also began using the Mark at trade shows like the well-known

18  MAGIC fashion show in Las Vegas, Surf Expo in Florida, and the ASD Market Week

19  consumer merchandise trade show, and in fundraisers such as the Tuna Challenge for the

20  Make a Wish Foundation and Life Rolls On, generating a national following for the brand.

21  *Id*. With greater exposure, the Mark gained even greater popularity, becoming a lifestyle

22  and resort brand promoting a positive attitude and outlook. *Id.*

23          As the popularity of the brand grew, Scott incorporated the family business as No

24  Bad Days Enterprises, Inc. ("NBD") in or about 2012. *Id.* ¶ 5. NBD and its licensees have

25  sold millions of units of clothing and other items under the Mark, including t-shirts, swim

26  trunks, dresses, decals, mugs, keychains, and license plate holders. *Id.* Products bearing the

27  Mark are distributed to national and regional chains including JCPenney, TJ Maxx,

28  Marshalls, the Men's Wearhouse, and U.S. Military Base Exchange stores as well as to

hundreds of independent retailers throughout the United States (such as the California Surf Museum). *Id.*





**Representative Samples of NBD's Use of the Mark. Sample Decl. ¶ 5.**

The NO BAD DAYS Mark is unquestionably an important component of NBD's success and holds tremendous value. Accordingly, Thomas Sample first received U.S. trademark registration number 2,219,259 in January 1999 for the mark NO BAD DAYS for "shirts and sun visors." *Id.* ¶ 7. Scott and NBD subsequently filed for and received eight more U.S. trademark registrations for the mark NO BAD DAYS over the years. This includes incontestable registration 3,396,343 (registered in March 2008) covering International Class 25 goods, such as hats, jackets, pants, shirts, shorts, sweaters, swimsuits and t-shirts. *Id.* ¶ 8, Ex. A NBD's other current registrations cover items such as decals, key chains, mugs and beer, whiskey, wine and vodka. *Id.* Tom, Scott and now NBD have continuously used the Mark from Tom's first sales in the 90's to the present day. *Id.* ¶ 10.

///

///

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Cove's Infringing Clothing And Other Goods Also Sold Online**

On October 9, 2020, NBD discovered that Cove was selling its own competing clothing items and decals bearing the Mark via Shopify, as well as on Cove's own website located at www.coveusa.shop. Sample Decl. ¶ 12.



*Representative Samples of Cove's Infringing Goods*

Among other things, Cove was selling and is selling T-shirts and "hoodie" sweatshirts prominently bearing the NO BAD DAYS Mark. *Id.* Cove never sought or obtained permission from NBD to use the Mark. Sample Decl. ¶ 18.

NBD's No Bad Days products and Cove's infringing goods are advertised in similar manners and are targeted toward the same buying demographic. For example, both companies' market themselves as eco-conscious. Sample Decl. ¶ 15. Also, a comparison of the advertising of NBD's products and Cove's infringing products (center; dashed in red) are shown below. (Sample Decl. ¶ 13.)



4

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1       Further, the graphics used by both companies are similar. Below is a comparison of

2   Cove's infringing t-shirt design (center of top row; dashed in red) and a sampling of NBD's

3   t-shirt designs:

  

  

(Sample Decl. ¶ 14.)

    Likewise, Cove's infringing decals bear a striking similarity to NBD's own design:

 



**NBD's Design**                              **Cove's Decal**

(Sample Decl. ¶16.)

5

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

According to comments posted on these websites, Cove's infringing clothing is of cheaper quality which has led to a number of criticisms of the products. *See, e.g.,* Sample Decl. Exs. C - F. At the same time, these online purchasers are showing actual confusion between NBD's legitimate "No Bad Days" products and Cove's knock-offs. For example, one customer posted disappointment that their Cove purchase did not come with a free decal "as it was advertised on the website." Sample Decl., Ex. E. In fact, ***NBD's*** website advertises free decals included with purchases, confirming that this customer visited NBD's website and later purchased a product from Cove mistakenly believing it to be from NBD (and thus was entitled to a free decal). Sample Decl ¶ 20.

NBD submitted takedown notices to Shopify in October and again in November 2020, placing Cove on notice of its infringing activities. Sample Decl. ¶ 21. Shopify caused Cove's Infringing Goods to be delisted. Further, Shopify's November 10, 2020 email stated "[w]e have informed the merchant that the reported content must remain offline..." Sample Decl., Ex. I. However, Cove refused to stop selling products bearing the NBD Mark, and to date Cove continues to sell its infringing products. *Id.* ¶ 22.

### III.   LEGAL STANDARD FOR PRELIMINARY INJUNCTION

In the trademark context, 15 U.S.C. § 1116(a) specifically authorizes courts to grant preliminary relief "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."

A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.,* 609 F.3d 975, 982 (9th Cir. 2010). In deciding a motion for a preliminary injunction, a court has broad discretion to consider all arguments and evidence, including hearsay and evidence that is otherwise inadmissible. *See, e.g., Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## IV.  COVE'S SALES OF INFRINGING NO BAD DAYS GOODS SHOULD BE ENJOINED PENDING TRIAL

### A.   NBD Is Likely To Succeed On The Merits Of Its Trademark Claims

NBD's trademark claims against Cove arise under 15 U.S.C. § 1114, and common law, for infringement of NBD's federally registered trademark "NO BAD DAYS." For each claim, the trademark owner is required to show (1) it has a valid, protectable trademark, and (2) that the alleged infringer is using a mark that creates a likelihood of consumer confusion. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1046-47 n.8 (9th Cir. 1999).

Even at this early stage and without the benefit of discovery, the evidence is sufficient to satisfy both elements. Accordingly, NBD is likely to succeed on the merits of its trademark infringement and unfair competition claims against Cove.

### i.   *The NO BAD DAYS Mark is Valid and Protectable*

When a trademark registration becomes incontestable, subject to a few select defenses, the "validity and legal protectability, as well as the [registrant's] ownership therein, are all conclusively presumed." *Brookfield*, 174 F.3d at 1047 n.10. Here, NBD holds multiple federal registrations for the Mark, including No. 3,396,343, registered on March 11, 2008. That registration has now reached incontestable status, and therefore constitutes "conclusive evidence" of the validity of the Mark and of NBD's exclusive right to use the Mark in commerce. See 15 U.S.C. § 1115(b). Likewise, NBD's other current registrations for the Mark create a presumption of validity. *See Boldface Licensing + Branding v. By Lee Tillett*, Inc., 940 F. Supp. 2d 1178, 1186 (C.D. Cal. 2013) ("Federal registration of a trademark creates a presumption that the mark is valid, and where the PTO registers a mark without proof of secondary meaning, 'the presumption is that the mark is inherently distinctive.' This shifts the burden to the alleged infringer to demonstrate that the mark is not protectable.") (*citing Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010)).

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1     Accordingly, the first element of trademark infringement is met in this case.

2

3                    ii.   _Cove's Goods are Likely to Cause Confusion_

4          With respect to the second element, the Ninth Circuit has identified eight factors

5     relevant to determining likelihood of confusion: (1) the strength of the mark; (2) the

6     proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5)

7     the marketing channels used; (6) the type of goods and degree of care likely to be exercised

8     by the purchaser; (7) defendant's intent in selecting the mark; and (8) the likelihood of

9     expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th

10    Cir. 1979). In evaluating these eight factors, the Court should examine the "total effect of

11    [Cove]'s product and package on the eye and mind of an ordinary purchaser." *First Brands

12    Corp. v. Fred Meyer, Inc*., 809 F.2d 1378, 1383-84 (9th Cir. 1987). Here, each of the

13    *Sleekcraft* factors either supports a determination that Cove's goods are likely to cause

14    confusion or is inapplicable to the parties' directly competing goods and market overlap.

15

16         **a.      The NO BAD DAYS Mark is strong**

17         Marks are placed in one of five categories, ranging from weakest to strongest:

18    generic, descriptive, suggestive, arbitrary, and fanciful. *GoTo.com, Inc. v. Walt Disney Co.*,

19    202 F.3d 1199, 1207 (9th Cir. 2000). At one end of the spectrum, generic marks "refer[ ] to

20    the genus of which the particular product is a species" and "are not registerable" as

21    trademarks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc*., 469 U.S. 189, 194 (1985). At the

22    other end of the spectrum are arbitrary marks, words with no connection to the product,

23    such as Apple computers and Camel cigarettes, and fanciful marks, words with no

24    discernable meaning, such as Kodak film and Sony electronics. *Entrepreneur Media, Inc. v.

25    Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). "Descriptive terms directly describe the quality

26    or features of the product." *Brookfield*, 174 F.3d at 1058 n.19. "A suggestive mark is one

27    for which 'a consumer must use imagination or any type of multistage reasoning to

28    understand the mark's significance, … the mark does not describe the product's features,

                                              8

                **COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

but *suggests* them." *Entrepreneur Media, Inc.*, 279 F.3d at 1142 (*quoting Kendall-Jackson Winery*, *Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)) (emphasis in original).

Here, the NO BAD DAYS Mark is properly categorized as either arbitrary or suggestive, as the Mark bears no relationship to the actual products (e.g., clothing or decals). Rather, the Mark is evocative of a particular mindset and lifestyle. Whether arbitrary or suggestive, the Mark is sufficiently strong to warrant trademark protection and to tip this factor in favor of NBD. *See, e.g., Playboy Enters. v. Chuckleberry Publ'g, Inc.*, 486 F.Supp. 414, 420 (S.D.N.Y. 1980) (holding that mark "Playboy" was suggestive, "in that the word 'playboy', evoking the aspirations, if not the life-style, of certain men, suggests to the imagination the nature of the magazine's content.")

Moreover, the strength of a mark can be further bolstered by commercial success. *See Entrepreneur Media*, 279 F.3d at 1144 (*citing Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991)). Here, NBD and its licensees have sold millions of products under the NO BAD DAYS Mark over the past twenty-plus years, with national distribution in both prominent retailers and independent stores. Further, the NO BAD DAYS Mark has been the subject of significant media recognition. Sample Decl. ¶ 11. The mark has also co-marketed with major brand holders such as No Fear, Toby Bost of O'Neill, Lost, Rusty, and Tyson Foods. *Id.* The Mark is also commonly sought out for acquisition by IP portfolio holders. *Id.* Accordingly, NBD's demonstrated commercial success using the Mark further evidences a strong mark, and thus this factor favors NBD.

### b.   The parties' goods are the same

The second factor relates to the similarity between the parties' goods. *Accuride Intern, Inc. v. Accuride Corp.*, 871 F.2d 1531 (9th Cir. 1989) (Proximity of goods refers to the increased likelihood that consumers will be confused "when the users of similar marks or names sell related goods.") In the instant case, this factor weighs heavily in favor of finding Cove's use is likely to cause confusion because the parties are direct competitors.

They operate in the same market, supply the same type of goods, and prominently use the identical phrase "No Bad Days" on their respective products.

### c.     The parties' marks are identical

Once again, this factor weighs heavily in favor of NBD, because Cove is using an *identical* copy of NBD's Mark on its products. The Mark is registered using standard characters, with no limitations, and NBD has used a variety of fonts and colors over the years. Sample Decl., ¶ 17. Accordingly, the important element of the Mark is the phrase itself. Cove has lifted that phrase lock, stock and barrel and prominently displayed it on its own goods in order to generate sales.

### d.     The parties' goods are sold in the same channels of trade

The use of "convergent marketing channels" increases the likelihood of consumer confusion. *Sleekcraft*, 599 F.2d at 353. "[T]he [internet], as a marketing channel, is particularly susceptible to a likelihood of confusion since . . . it allows for competing marks to be encountered at the same time, on the same screen." *GoTo.com*, 202 F.3d at 1207. "In determining whether there is a likelihood of confusion, we rely heavily on the fact that the marks are similar, that [the parties] offer very similar services, and that they both use the web as their marketing channel. This trinity constitutes the most crucial body of the *Sleekcraft* analysis, and, in this case, it suggests that confusion is indeed likely." *Id. See, e.g., Maxim Integrated Prods. v. Quintana,* 654 F.Supp.2d 1024, 1032 (N.D.Cal. 2009) (finding that where plaintiff and defendant "use the Internet as a significant marketing channel for their products," this factor weighs in favor of the senior user.) Here, both Cove and NBD sell their products online through e-commerce stores, and accordingly, this factor weighs in favor of NBD.

///

///

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

### e.   Consumers are unlikely to exercise care when purchasing Cove's products

"[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Brookfield*, 174 F.3d at 1060. Courts have repeatedly held that, for products such as t-shirts and sweatshirts with relatively low price points, consumers are not likely to exercise a heightened degree of care. *See, e.g., Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303, 312 (D.Mass. 1995) ("Despite the dissimilarities between the designs, this court concludes that the similarity in overall conception is so strong as to make confusion inevitable. The consumers of an inexpensive t-shirt or sweatshirt, in taking a shirt off a rack or shelf, don't scrutinize labels, and would fairly assume that the goods were from the same source but with a different tone. The relevant standard is the 'total effect' of the mark, considering sight, sound, and meaning."); *Surf Line Hawaii, Ltd. v. Ahakuelo*, No. 88-00090 SPK, 1989 U.S. Dist. LEXIS 11869, at *12-13 (D. Haw. Sep. 22, 1989). ("T-shirts, as relatively inexpensive products, are more likely to be purchased on impulse than other, more expensive types of wearing apparel. The probable lesser degree of purchaser care also weighs in favor of a finding of likelihood of confusion."); *Grooms v. Legge*, No. 09cv489-IEG-POR, 2009 U.S. Dist. LEXIS 21456, at *21 (S.D. Cal. Mar. 17, 2009) ("The purchasers of t-shirts are unlikely to exercise great care in their purchases. Although plaintiffs make no representations as to the degree of care, this factor weighs in favor of finding a potential for consumer confusion.")

Thus, given the relatively inexpensive products sold by the parties (shirts, sweatshirts, decals, etc.), this factor also weighs in favor of NBD.

### f.   Cove is using the NO BAD DAYS Mark in bad faith

Evidence of intent or bad faith is unnecessary in showing a likelihood of confusion. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n.12 (9th Cir. 1998). However, "[w]hen one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose,

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1    and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative*
2    *House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991).
3    Here, Cove elected to use an **identical** copy of the Mark on its goods, and to continue using
4    the Mark even after being informed by NBD of its improper behavior. This indicates an
5    intent to deceive the public as to the origin of Cove's goods. *K-Swiss Inc. v. USA AISIQI*
6    *Shoes Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003); *see also Fiji Water Co., LLC v.*
7    *Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1165, 1177, 1181 (C.D. Cal. 2010)("The
8    obvious similarity between the new VITI bottle and the FIJI trade dress supports an
9    inference of deliberate copying.")

10
11                    **g.    Likelihood of expansion of product lines**
12           The potential expansion of product lines is not a relevant factor where the products
13    already directly overlap. *Grooms,* 2009 U.S. Dist. LEXIS 21456, at *22.

14
15                    **h.    Evidence of actual confusion**
16           Finally, "the absence of evidence of actual confusion on the part of consumers is not
17    fatal to a plaintiff's claim. Courts have recognized that proving actual confusion is difficult,
18    and as a result have found that inability to prove instances of actual confusion is not
19    dispositive of the issue of likelihood of confusion." *Surf Line Hawaii, Ltd.*, 1989 U.S. Dist.
20    LEXIS 11869, at *12, *citing Sleekcraft*, 599 F.2d at 352. On the other hand, evidence that
21    use of a mark or name has already caused actual confusion as to the source of a product or
22    service is "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.
23           Here – despite the fact that NBD has had little opportunity to conduct discovery or
24    locate examples of actual confusion – Cove's own website confirms that at least one
25    customer purchased a Cove product believing it to be from NBD. Specifically, a customer
26    identified as "Austin Standley" complained on Cove's e-store that his Cove t-shirt did not
27    come with free stickers "as it was advertised on the website." In fact, it is **NBD's** website
28    that advertises free stickers with a purchase of NBD's goods, meaning that this particular

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

1   customer visited NBD's website, decided to purchase an NBD product, and then

2   mistakenly purchased the product from Cove (as demonstrated by the lack of a decal and

3   his posting on Cove's website, not NBD's).

4        Thus, all of the *Sleekcraft* factors either weigh in favor of NBD or are irrelevant (in

5   the case of expansion of product lines) because Cove is already selling the same goods as

6   NBD using NBD's Mark. Accordingly, NBD has established a likelihood of success on its

7   trademark claims.

8

9        **B.**    **NBD Is Entitled To A Presumption Of Irreparable Harm**

10        Until 2013, the Ninth Circuit followed several other circuits in recognizing a

11   rebuttable presumption of irreparable harm upon a finding of likelihood of success on the

12   merits. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F.3d 819, 827 (9th Cir. 1993)

13   ("In trademark cases, once the plaintiff establishes a likelihood of confusion between the

14   plaintiff's mark and the defendant's, it is ordinarily presumed the plaintiff will suffer

15   irreparable harm if injunctive relief is not granted."). In 2013, the Ninth Circuit abandoned

16   that presumption and began requiring the plaintiff to affirmatively establish that irreparable

17   harm will result absent injunctive relief. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt.,*

18   *Inc*., 736 F.3d 1239, 1249 (9th Cir. 2013) (holding "that a plaintiff must establish

19   irreparable harm" to prevail on a motion for preliminary injunction in a trademark

20   infringement case).

21        Effective December 27, 2020, however, the Trademark Modernization Act modified

22   15 U.S.C. § 1116, which relates to injunctive relief in trademark actions. *See* Pub. L. 116-

23   260, § 226, 134 Stat. 2208 (2020). Congress inserted an additional sentence into the statute:

24   "A plaintiff seeking any such injunction **shall be entitled to a rebuttable presumption of**

25   **irreparable harm** upon a finding of a violation identified in this subsection in the case of a

26   motion for a permanent injunction or upon a finding of likelihood of success on the merits

27   for a violation identified in this subsection in the case of a motion for a preliminary

28   injunction or temporary restraining order." 15 U.S.C. § 1116(a) (emphasis added).

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

Congress thus overrode this circuit's precedents mandating affirmative evidence of such harm and created an automatic presumption that irreparable harm exists. Because NBD established a likelihood of success on the merits as shown above, it is therefore entitled to a presumption that irreparable harm also exists.

Further, the evidence supports such a presumption. Numerous comments on Cove's website show complaints about the poor quality of its knockoff products. *See, e.g.,* Ex. C at p.3, 3/15/21 comment ("the collar of the shirt is of low quality (at least in appearance and aesthetics for longevity) and too large of a diameter."); *Id.* (complaints about incorrect sizing); Ex. D at p. 3, Thomas Wilson comment ("mine had a bit of loose seams on the outside behind the neck and it is separating from the shirt"); Ex. E at p. 3, Kyle Katz comment ("The collar of the shirt doesn't sit well…."); Ex. F, Revecca Jones comment ("I received my shirts and the design was way off center by at least 4 inches making it unwearable. I reached out to customer support and haven't heard anything back."). As noted above, there is also evidence of actual confusion between NBD and Cove. Thus, there is actual danger that consumers will begin mistakenly associating the poor quality of Cove's products with NBD, damaging the reputation for quality and customer satisfaction that Scott, his father, his family and their company have spent decades building.

## C.     The Balance Of Equities Favors NBD

Because the *Sleekcraft* factors favor NBD, the balance of equities also tips sharply in its favor. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991) ("Given the above six [*Sleekcraft*] factors [favoring the plaintiff], the balance of hardships tips sharply in [plaintiff's] favor and it would have been an abuse of discretion for the district court ***not*** to grant the preliminary injunction.") (emphasis in original). NBD's loss of consumer goodwill outweighs any potential losses arising from Cove's inability to use the Mark until a decision on the merits, particularly as Cove can continue to sell its goods without the infringing use of the Mark. Indeed, "[t]he loss of sales dependent on the continued use of an infringing product does not constitute irreparable harm from which the

14

1  infringer should be shielded." *Mytee Prods. v. Harris Research, Inc.*, No. 06cv1854 CAB,
2  2010 U.S. Dist. LEXIS 148461 at *2 (S.D. Cal. June 25, 2010).

3

4      **D.      An Injunction Is In The Public Interest**

5          In cases of alleged trademark infringement, courts define the public interest as
6  "avoiding confusion in the marketplace." *Seed Servs., Inc. v. Winsor Grain, Inc.,* 868 F.
7  Supp. 2d 998, 1005 (E.D. Cal. 2012). "In trademark cases, this factor is often addressed in
8  terms of the public's right 'not to be deceived or confused.'" *Moroccanoil, Inc. v.*
9  *Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1282 (C.D. Cal. 2008) (*quoting Opticians*
10 *Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 198 (3rd Cir. 1990)).

11          Accordingly, because there is a likelihood of consumer confusion if Cove continues
12 to use the Mark (indeed, there is ***already*** confusion in the marketplace), an injunction will
13 serve the public's interest by eliminating or reducing the possibility for any further
14 confusion.

15

16 **V.     A BOND IS UNWARRANTED IN THIS CASE**

17          "The district court may dispense with the filing of a bond when it concludes there is
18 no realistic likelihood of harm to the defendant from enjoining his or her conduct."
19 *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *BYD Co. v. Khazai*, No. CV 20-
20 5530-DMG (AGRx), 2020 U.S. Dist. LEXIS 121889, at *14 (C.D. Cal. July 10, 2020)
21 (waiving bond requirement "because Defendants are not likely to suffer harm as a result of
22 being enjoined from engaging in illegal conduct.")

23          Because Cove's use of the Mark is itself illegal, the enjoining of such use pending
24 trial will not create a realistic likelihood of harm. Accordingly, the Court should waive any
25 need for a bond in this case.

26 ///

27 ///

28 ///

---

15

**COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION**

# VI.   **CONCLUSION**

Because NBD satisfies the four requirements for a preliminary injunction, it requests this Court enter an order that preliminarily enjoins and restrains Cove, its agents, servants, officers, directors, owners, employees, representatives, attorneys, and all others acting under, or with, them, from:

- Using the NO BAD DAYS Mark or any other mark confusingly similar to the Mark alone or in combination with other words, as a trademark, trade name, component or otherwise, to market, promote, advertise or identify Cove's goods or services;

- Using the designation "No Bad Days" or any colorable imitation thereof upon any product or on Cove's websites, advertising or promotional material, either in print or broadcast or electronic form or other forms either separately or compositely with other words, symbols, or devices as a trademark with any products including clothing or decals;

- Holding themselves out as the owner of, or a company authorized to use, as part of its name, the Mark, or a name confusingly similar thereto; and

- Using any words, names, styles, titles or marks, which create a likelihood of injury to the business reputation of NBD, or a likelihood of misappropriation or dilution of NBD's trademarks and the goodwill associated therewith.

Dated:  April 27, 2021                                   **NEXIO, PC**

By: ___ /s/ Imran F. Vakil /
       Imran F. Vakil
       *Attorneys for Counterclaimant,*
       *No Bad Days Enterprises, Inc.*

16